861 F.2d 266
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Mohammed M. SHYLLON, Plaintiff-Appellant,
v.
EASTERN AIRLINES, INC., Defendant-Appellee.
 No. 87-3190.
 United States Court of Appeals, Fourth Circuit.
 Argued: June 8, 1988.
Decided: Oct. 6, 1988.
 
 Kenneth M. Flaxman, for appellant.
 Leslie Calkins O'Toole (Richard W. Ellis, Smith, Helms, Mulliss & Moore, on brief), for appellee.
 Before WIDENER and WILKINS, Circuit Judges, and PAUL V. NIEMEYER, United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 Mohammed M. Shyllon shipped the remains of his deceased father to Sierra Leone by way of Eastern Airlines, Inc. Although Eastern confirmed that the body would be delivered by March 17, 1985, it was actually delivered in Sierra Leone four days later, after the scheduled wake. The district court, ruling on a motion for directed verdict at trial, limited plaintiff's damages to $9.07 per pound, as provided by the Warsaw Convention, and denied that plaintiff had proved any evidence of wilful misconduct by Eastern which would have permitted Shyllon recovery of damages beyond the limitations of the Warsaw Convention. On appeal of the directed verdict ruling, we affirm.
 
 
 2
 * Kanasia Shyllon, a native of the West African country of Sierra Leone, died in North Carolina while visiting his son, Mohammed Shyllon, who lived there. Mohammed Shyllon engaged the Lightner Funeral Home to arrange for the shipment of the remains from North Carolina to Sierra Leone for a wake and burial. The funeral home contacted Eastern, who scheduled the remains for shipment on an Eastern flight from North Carolina to New York, an Air France flight from New York to Paris, and a UT Airlines flight from Paris to Sierra Leone. The remains were scheduled to arrive in Sierra Leone on March 17, 1985. Clarence Lightner testified that Eastern had "confirmed" that "if we shipped by the 15th [it] would ... be there by the 18th." Shyllon understood this to mean that reservations were confirmed for shipment of the remains on each of the three flights between North Carolina and Sierra Leone. Based on this understanding, Shyllon left the United States on or about March 12, 1985, and scheduled a wake and burial around the scheduled arrival date of March 17, 1985.
 
 
 3
 The remains were delivered to Eastern on March 15, 1985. Eastern had succeeded in confirming space on its own flight and the UT flight, but it had not yet received confirmation for the Air France flight in spite of four attempts by computer to obtain it. It was not unusual for airlines, in fact the testimony was that it was quite common, to accept human remains for international shipment without confirmation from connecting carriers because, by industry practice, human remains are given a high priority for cargo space, regardless of whether space for them has been confirmed. The evidence showed that Eastern had shipped human remains on hundreds of occasions and, 75% of the time, responses to requests for confirmation were never received. On no occasion had Eastern ever been refused shipment of remains. Acceptance of human remains by a connecting carrier was routine and the failure to obtain confirmations for space did not increase the risk of delay of their arrival.
 
 
 4
 Eastern's records show that the remains of Shyllon's father were transported on the Eastern flight to New York as scheduled and were transferred to Air France. There are no records to explain what happened to the remains after transfer to Air France, but it is agreed that Air France did not ship the remains for some unexplained reason. Because of that delay, the remains were rerouted by other airlines and arrived in Sierra Leone on March 21, 1985, approximately three to four days after the date which had been given by Eastern's representatives in North Carolina.
 
 
 5
 Because of the delay, Shyllon was forced to schedule a second wake at extra expense to himself. He sued Eastern for both compensation for the expenses incurred in scheduling a second wake and funeral and for damages for the emotional distress he suffered while the whereabouts of his father's remains were unknown.
 
 
 6
 At trial, Shyllon contended that Eastern's conduct constituted wilful misconduct. He presented evidence that Eastern had given "the usual confirmation and assurance that the remains would be at the destination at the agreed time," and that Eastern had confirmed that "if we shipped by the 15th, it would be there by the 18th." Shyllon urged that these statements, when coupled with the absence of confirmation from Air France, constituted wilful misconduct and reckless disregard of his rights.
 
 
 7
 At the close of the plaintiff's case, the district court granted defendant's motion for a directed verdict on plaintiff's claims of intentional infliction of emotional distress and punitive damages but denied the motion as to the claim of wilful misconduct. At the close of all the evidence, the district court, finding that there was insufficient evidence to submit to the jury the issue of wilful misconduct, granted defendant's motion for a directed verdict and entered judgment for the plaintiff in the amount of $3,228.92 based on the per pound limitation imposed by the Warsaw Convention.
 
 II
 
 8
 Article 22 of the Warsaw Convention limits the liability of an air carrier for checked baggage and goods to 250 francs per kilogram (or $9.07 per pound) unless excess value is declared and, if required, an additional sum is paid. Article 25(1) makes this limitation inapplicable, however, in the case of wilful misconduct on the part of the carrier. It provides:
 
 
 9
 The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.
 
 
 10
 As applied in the federal cases in this country, "wilful misconduct under the Convention means 'the intentional performance of an act with knowledge that the ... act will probably result in injury or damage or the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences.' " Johnson v. American Airlines, Inc., 834 F.2d 721 (9th Cir.1987).
 
 III
 
 11
 The evidence on which Shyllon relies are the promissory statements "confirming" that his father's remains would arrive at a specified time in Sierra Leone. Although Shyllon understood from representatives of the Lightner Funeral Home that "confirmed reservations" had been made, the representatives of the funeral home who actually made the arrangements with Eastern testified that Eastern "confirmed" that "if we shipped by the 15th [it] would ... be there by the 18th" and that he received "the usual confirmation and assurance that the remains would be at the destination at the agreed time." The evidence does not support a contention that there were misrepresentations of fact or that such promises were made without any expectation on the part of Eastern that they could have been fulfilled. The most that could be urged is that these statements were promises which, if breached, would be subject to the limitations of the Warsaw Convention.
 
 
 12
 Even interpreting Eastern's statements to representatives of Lightner as misrepresentations, such statements fail to rise to the level of wilful misconduct. There was no evidence that Eastern made any of the statements with either knowledge or reckless disregard of its good faith belief that the promises could not be fulfilled or with knowledge of the probable injury to Shyllon that would result if the deliveries were not made on the date specified. This absence of knowledge is fortified by the evidence of the industry-wide practice of giving priority to the shipment of human remains ahead of general cargo, regardless of whether a confirmation for the shipment has been made. Also, there was no evidence that Eastern participated in any way in the conduct that was responsible for the actual delay in the shipment of the remains. In short, Shyllon failed to introduce sufficient evidence from which the jury could have found or inferred wilful misconduct on the part of Eastern.
 
 
 13
 Having denied the motion for a directed verdict on the issue of wilful misconduct at the conclusion of plaintiff's case and having received all the evidence before finally granting the motion for a directed verdict at the conclusion of the case, the district court might have found it more practical to submit the issue to the jury and consider it later, if necessary, on a motion for judgment notwithstanding the verdict. Nevertheless, for the reasons given, the judgment of the district court is
 
 
 14
 AFFIRMED.